# United States Court of Appeals for the Federal Circuit

_____

**CGI FEDERAL INC.,**
*Plaintiff-Appellant*

v.

**UNITED STATES,**
*Defendant-Appellee*

_____

2014-5143

_____

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00355-MCW, Judge Mary Ellen Coster Williams.

_____

Decided: March 10, 2015

_____

SCOTT M. MCCALEB, Wiley Rein, LLP, Washington, DC, argued for plaintiff-appellant. Also represented by DANIEL PATRICK GRAHAM, CHRISTINE ALICE REYNOLDS, GARY SCOTT WARD.

WILLIAM PORTER RAYEL, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JOYCE R. BRANDA, ROBERT E. KIRSCHMAN, JR., KIRK MANHARDT.

MICHAEL J. SCHAENGOLD, Greenberg Traurig LLP, Washington, DC for amicus curiae. Also represented by MELISSA PAIGE PRUSOCK, AARON S. RALPH.

————————————

Before MOORE, TARANTO, and CHEN, *Circuit Judges.*

MOORE, *Circuit Judge.*

In this pre-award bid protest appeal, CGI Federal Inc. challenges the payment terms of requests for quotes ("RFQs") issued by the United States Department of Health and Human Service's Centers for Medicare and Medicaid Services ("CMS"). CGI argues that the payment terms violate certain statutory and regulatory provisions. The government responds, as it did below, that CGI did not have standing to bring its bid protest because it did not qualify as an "interested party" within the meaning of 28 U.S.C. § 1491(b)(1). Because the Court of Federal Claims correctly held that CGI qualified as an interested party at the time it filed its bid protest, but erred in holding that the payment terms do not violate the applicable regulations, we *reverse* and *remand.*

## BACKGROUND

In the contracts at issue, CMS uses contractors, such as CGI, to determine if Medicare claims were correctly paid. If the contractor identifies an overpayment, CMS sends a demand letter to the provider seeking repayment and pays the contractor a contingency fee. Pursuant to the original contracts from 2008, the contractors invoiced CMS for the contingency fee when the overpayment was collected from the provider, typically 41 days after the demand letter. In 2014, CMS issued new RFQs for these recovery services. The 2014 RFQs included additional payment terms requiring the contractors to wait to invoice CMS until a provider's challenge to the repayment request passed the second level of a five-level appeal

process, which typically occurs somewhere between 120 and 420 days after the demand letter.

Five different contractors bid on the 2014 RFQs, but CGI did not. Instead, before bidding closed, CGI filed a timely pre-award protest at the Government Accountability Office ("GAO") challenging the revised payment terms. While the GAO protest was pending, the bidding period closed. The GAO subsequently denied the protest. Three business days later, CGI filed a protest in the United States Court of Federal Claims. CGI and the government then filed cross-motions for judgment on the administrative record, and the government moved to dismiss for lack of standing. The Court of Federal Claims denied the government's motion to dismiss but granted its motion for judgment on the administrative record, holding that the modified payment terms do not violate statutory or regulatory provisions. *CGI Fed. Inc. v. United States*, No. 14-cv-00355-MCW, slip op. at 9-10, 18-21 (Fed. Cl. Aug. 15, 2014) ("*Opinion and Order*"). It also held that the payment terms do not unduly restrict competition. *Id.* at 22. CGI appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

### I.   Standing

Whether a party has standing is an issue of law that we review de novo. *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1298 (Fed. Cir. 2001) ("*AFGE*"). To have standing to bring a bid protest in the Court of Federal Claims, a plaintiff must be an "interested party." 28 U.S.C. § 1491(b)(1). While § 1491(b)(1) does not define "interested party," we have construed the term in accordance with the definition provided in the Competition in Contracting Act ("CICA"), 31 U.S.C. §§ 3551-56, "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the

contract or by failure to award the contract." *AFGE*, 258 F.3d at 1299 (quoting 31 U.S.C. § 3551(2)). Thus, to demonstrate that it has standing, CGI must show that it is (1) an actual or prospective bidder, and (2) that it has a direct economic interest. *Digitalis Educ. Solutions, Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012).

## A. Prospective Bidder

CGI never submitted a bid in response to the 2014 RFQs and thus is not an actual bidder. CGI must therefore show that it was a prospective bidder at the time it filed its protest in the Court of Federal Claims. We hold that it has made such a showing.

The parties primarily debate the implications of four cases in which we have opined on the meaning of "prospective bidder." A brief description of each case is helpful. In *MCI Telecommunications Corp. v. United States*, we considered the meaning of "prospective bidder" within the now-defunct Brooks Act, 40 U.S.C. § 759(f)(9)(B), which included a definition of "interested party" identical to the definition in CICA. 878 F.2d 362 (Fed. Cir. 1989). There, we held that MCI was not a prospective bidder because it did not participate in the bidding process and did not file the protest at issue until after the contract had been awarded. *Id.* at 364-65. We noted that MCI could not "achieve prospective bidderhood" via its post-award protest because "the opportunity to qualify either as an actual or prospective bidder ends when the proposal period ends." *Id.* at 365.

One year later in *Federal Data Corp. v. United States*, we held that Federal Data was not a "prospective bidder" within the meaning of the Brooks Act because it withdrew from the bidding process prior to filing a protest. 911 F.2d 699, 702-05 (Fed. Cir. 1990). "Federal Data knowingly took itself out of the bidding prior to filing its amended protest," and therefore "relinquished any chance of receiving the contract by that action." *Id.* at 703-04.

We noted that Federal Data "could have continued to compete for the contract award . . . and could have utilized the protest procedures available to an interested party to correct any deficiencies it perceived in the procurement process," but did not. *Id.* at 705. We stated that a "prospective bidder" "does not include one who only intends to bid in the event of a reprocurement." *Id.* at 704.

We considered the meaning of "prospective bidder" in the context of an interested party under § 1491 in *Rex Service Corp. v. United States*, 448 F.3d 1305 (Fed. Cir. 2006). Rex initially filed a pre-award protest with the agency. *Id.* at 1307. The agency denied its protest, and Rex, having not submitted a bid, did not pursue the matter further. *Id.* The agency subsequently awarded the contract to another party and—two months after the award and three months after the agency denied its initial protest—Rex filed a post-award protest in the Court of Federal Claims, raising issues entirely different from those raised in its agency protest. *Id.* We held that Rex was not a prospective bidder because it "could have bid, but chose not to." *Id.* at 1308. We noted that in Rex's case, its pre-award agency protest was "not relevant" to determining its prospective bidder status. *Id.* We again noted that "'the opportunity to qualify either as an actual or a prospective bidder ends when the proposal period ends.'" *Id.* (quoting *MCI*, 878 F.2d at 365). We held that "In the end, Rex did not submit a bid; nor did it file a timely bid protest in the Court of Federal Claims." *Id.*

Finally, in *Digitalis*, we held that a protestor that failed to submit the required statement of capability to the agency in the allotted time period and filed its Court of Federal Claims protest more than two months after the contract was awarded was not a prospective bidder. 664 F.3d at 1383-86. Citing to both *MCI* and *Rex*, we again noted that "the opportunity to become a prospective bidder ends when the proposal period ends." *Id.* at 1385.

While none of these cases is directly on point, together they are instructive. In each case, the party failed to obtain prospective bidder status because it did not diligently pursue its protest rights, e.g., by failing to file any protest until well after a contract award (*MCI*, *Digitalis*), affirmatively abandoning any interest in the contract (*Federal Data*), or delaying months after both denial of a timely protest and the award of a contract before filing the protest at issue (*Rex*).

The same cannot be said of CGI, which diligently and continuously pursued its rights in the GAO and then, immediately upon dismissal by the GAO, in the Court of Federal Claims.[1] Neither party disputes that CGI qualified as a prospective bidder on the day that it filed its GAO protest. Thus, it "achieve[d] prospective bidderhood" at that time. *MCI*, 878 F.2d at 365. The fact that—as *MCI*, *Federal Data*, and *Digitalis* all make clear—CGI's opportunity to *qualify* as a prospective bidder ends when the solicitation period ends does not doom CGI because it had already achieved prospective bidder status with its timely GAO protest. It seems equally clear that CGI retained its prospective bidder status throughout the pendency of its GAO protest because it was continuously pursuing its challenge to the payment terms in the 2014

---

[1]    The government argues that our precedent precludes standing for "'one who *only* intends to bid in the event of a reprocurement.'" Appellee's Br. at 24 (quoting *Federal Data*, 911 F.2d at 704) (emphasis added). CGI is not one who only intends to bid in the event of a reprocurement. CGI is a prospective bidder who filed a protest during the bidding period. CGI diligently pursued its interests and rights in the process from GAO protest (filed prior to the expiration of the bidding period) to present day.

RFQs.[2] The question, then, is whether CGI lost its prospective bidder status during the three business days between the GAO denial and filing the Court of Federal Claims protest. In other words, has this brief passage of time or some affirmative act stripped CGI of its prospective bidder status? In this case, the answer is no.

While we recognize that the government has been guided in its view by language in *Rex,* we agree with the Court of Federal Claims, which concluded that CGI's position is readily distinguishable from the protestor in *Rex.* In *Rex*, the protestor waited nearly three months after the agency denied its initial protest before filing the protest at issue and, in the interim, the agency awarded the contract to another bidder. *Rex*, 448 F.3d at 1307. Here, CGI filed its Court of Federal Claims protest within three business days of receiving its dismissal from the GAO and before CMS had awarded the contract.[3] CGI,

---

[2] The government argued that CGI's prospective bidder status dissolved on the day bidding ended in the middle of its GAO protest. Oral Argument 23:10-24:15, 25:55-26:29, *available at* http://oralarguments.cafc. uscourts.gov/default.aspx?fl=2014-5143.mp3. We do not agree. CGI was a prospective bidder by virtue of filing a timely protest and its status did not dissolve in the midst of this protest while it was diligently pursuing its rights. The government presents no authority or good reason for concluding otherwise. Indeed, in discussing statutory standing in court, it states that "the proper inquiry is whether CGI had or was expecting to submit quotes at the time it filed its lawsuit" in court. Appellee's Br. at 25. We see no basis for a different view for the GAO process.

[3] The Court of Federal Claims also distinguished *Rex* by noting that the subsequent Court of Federal Claims protest "had nothing to do with" the earlier agency protest. *Order and Opinion* at 13. It is correct that the

having secured prospective bidder status by filing its timely GAO protest, did not lose it in the three business days it took to file in the Court of Federal Claims.[4] We acknowledge that *Rex* explained that the timely filed agency protest was "not relevant to Rex's status" as a prospective bidder at the time that it filed its Court of Federal Claims protest. This, we conclude, is because Rex failed to continue to pursue its rights in a diligent fashion, and thus ceased to be a prospective bidder. Rex's agency denial was met with inaction. That inaction persisted for months, and during that time the government awarded the contract. By the time Rex filed its Court of Federal Claims protest, its agency protest was no longer relevant.

Were we to adopt the government's argument that CGI is not a prospective bidder, it would create a chasm between an actual bidder and a prospective bidder in terms of the review rights accorded to each. For example,

_____

two protests in *Rex* were unrelated; they were premised upon different grounds of alleged illegality. It is also correct that CGI made the same arguments before the Court of Federal Claims as it did before the GAO. It has diligently pursued its claim that the solicitation's terms were illegal in both fora. It is not immediately apparent, and given the facts here we need not decide, how any change in arguments by a continuously diligent protestor affects prospective bidder status—an issue distinct from whether a protestor waived arguments. *See, e.g.*, *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

[4]   A longer delay than necessary may be a factor in the Court of Federal Claims declining to exercise jurisdiction. For example, 28 U.S.C. § 1291(b)(3) states that "[i]n exercising jurisdiction under this subsection, the courts shall give due regard to . . . the need for expeditious resolution of the action."

an actual bidder would undisputedly have the right to serially file a protest in the GAO and then, if the GAO protest were denied, in the Court of Federal Claims. If we accepted the government's position, this sequence of redress would not be available to a prospective bidder. It would be virtually impossible to file a timely GAO protest, wait for a GAO decision, and then file a protest in the Court of Federal Claims prior to the close of bidding. By the time the GAO protest concluded, bidding would almost certainly be closed. Oral Argument 30:30-31:15. And the two cannot proceed simultaneously. 4 C.F.R. § 21.11(b) ("GAO will dismiss any case where the matter involved is the subject of litigation before . . . a court of competent jurisdiction."). We see nothing in this statute, CICA (from which we derived the actual or prospective bidder requirement), or any policy justification for differing treatment among actual and prospective bidders. We have been presented no indication that Congress intended different review rights for actual and prospective bidders.

CGI was a prospective bidder when it promptly initiated and diligently pressed its protest in the GAO forum, which Congress has encouraged protestors to use before suing in court. Unsuccessful in the GAO, it immediately filed for relief in court. We do not think that Congress meant for a protestor in CGI's position to lose its entitlement to sue just because delays engendered by the GAO adjudicatory process pushed completion past the closing date for bid submissions. Concluding, as we do, that CGI filed a protest prior to the close of bidding and thereby established its prospective bidder status, and that CGI thereafter diligently pursued its rights, CGI has prospective bidder status to pursue its Court of Federal Claims protest.

### B. Direct Economic Interest

To have standing, CGI must also have a direct economic interest affected by the award of the contract.

*Digitalis*, 664 F.3d at 1384.  CGI can satisfy this requirement by showing that it suffered "a non-trivial competitive injury which can be redressed by judicial relief." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361-62 (Fed. Cir. 2009).  CGI has made such a showing.  CGI argues that the payment terms in the 2014 RFQs are illegal and that they caused CGI to protest instead of bid. Reply Br. at 26.  This injury is both non-trivial and competitive, and CGI has sought judicial relief via its protest in the Court of Federal Claims.  As the Court of Federal Claims correctly concluded, "CGI had 'a definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations.'"  *Opinion and Order* at 17 (quoting *Weeks Marine*, 575 F.3d at 1362).

The government argues that the revised payment terms are not a competitive injury because the payment terms "'equally disadvantaged' all prospective bidders." Appellee's Br. at 32 (quoting *Opinion and Order* at 24). This argument is unavailing.  The government made the same argument in *Weeks Marine*, 575 F.3d at 1360, and we implicitly rejected it by concluding that the protestor in that case demonstrated a non-trivial competitive injury, *id.* at 1360-62.

\* \* \* \* \*

Because CGI was a prospective bidder with a direct economic interest affected by the award of the contract, we conclude that CGI had standing to file its protest in the Court of Federal Claims.  We therefore turn to the merits.

## II.  Challenge to Payment Terms

### A.  Background

The Federal Acquisition Streamlining Act of 1994 ("FASA") was implemented to "revise and streamline the acquisition laws of the federal government" and "facilitate the acquisition of commercial products."  S. Rep. No. 103-

259, at 1 (1994). To that end, FASA reformed government procurement by requiring the federal government to purchase commercial items under commercial terms to the extent practicable. In particular, FASA provides that the Federal Acquisition Regulations ("FAR") include "a list of contract clauses to be included in contracts for the acquisition of commercial end items," and that the list, to "the maximum extent practicable . . . shall include only those contract clauses that are . . . determined to be consistent with standard commercial practice." 41 U.S.C. § 3307(e)(2)(B). FASA also requires that, "[t]o the maximum extent practicable, only the contract clauses [in the above-mentioned list] may be used in a contract . . . for the acquisition of commercial items." *Id.* § 3307(e)(2)(D).

FAR Part 12 was created to implement FASA. FAR Part 12 states that it "shall be used for the acquisition of supplies or services that meet the definition of commercial items." 48 C.F.R. § 12.102(a). FAR Part 12 implements FASA's mandate by requiring that "contracts for the acquisition of commercial items shall, to the maximum extent practicable, include only those clauses" required by law or "[d]etermined to be consistent with customary commercial practice." *Id.* § 12.301(a). It precludes the inclusion of "any additional terms or conditions in a solicitation or contract for commercial items in a manner that is inconsistent with customary commercial practice for the item being acquired unless a waiver is approved in accordance with agency procedures." 48 C.F.R. § 12.302(c).

The Federal Supply Schedule ("FSS") program provides a simplified process for the government to obtain commercial supplies by negotiating underlying FSS contracts with suppliers of commercial products and then allowing executive agencies to issue orders for those commercial products pursuant to the underlying FSS contract. *See Sharp Elecs. Corp. v. McHugh*, 707 F.3d

1367, 1369 (Fed. Cir. 2013). FAR Subpart 8.4 governs the FSS program. 48 C.F.R. §§ 8.401-8.406.

## B. Whether the 2014 RFQ Payment Terms Violate FAR Part 12

The 2014 RFQs being challenged here were issued pursuant to the Financial and Business Solutions Schedule, an underlying FSS contract. The Court of Federal Claims found, and neither party disputes, that the services solicited in the 2014 RFQs are commercial items and that the revised payment terms therein are inconsistent with customary commercial practice. *Opinion and Order* at 9, 19; *see* Oral Argument 37:45-41:45. We affirm these undisputed fact findings.[5] Thus, the only issue is whether FAR Part 12's proscription against terms that are inconsistent with customary commercial practice applies to the 2014 RFQs. If it applies, the payment terms are in violation.

Before the Court of Federal Claims, the government does not appear to have disputed that FAR Part 12's proscription against terms inconsistent with customary commercial practice applies to solicitations for the underlying FSS contracts themselves. *Opinion and Order* at 12. However, the government argued that FAR Part 12's proscription does not apply to orders made pursuant to the existing FSS contracts. The Court of Federal Claims agreed. *Opinion and Order* at 19-22. It reasoned that FAR Subpart 8.4, which governs the FSS program, does

---

[5] The government, in response to oral argument questions, indicated that the Court of Federal Claims was without authority to find that the revised payment terms were inconsistent with customary commercial practices. We deem this issue waived by the government. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006).

not expressly state that FAR Part 12 applies to orders made pursuant to an existing FSS contract. *Opinion and Order* at 20. It similarly found that FAR Part 12 does not expressly state that its provisions apply to such orders. *Opinion and Order* at 20-21. We review the Court of Federal Claims interpretation of the applicable regulations de novo. *Abbott Labs. v. United States*, 573 F.3d 1327, 1330 (Fed. Cir. 2009).

We conclude that FAR Part 12's proscription against terms inconsistent with customary commercial practice applies to the 2014 RFQs and therefore that the RFQs violate that proscription.[6] On a general level, FAR Part 12 applies to the 2014 RFQs because it makes clear that it "shall be used for the acquisition of [commercial items]." 48 C.F.R. § 12.102(a). The 2014 RFQs meet the broad definition of an "acquisition" under FAR:

> Acquisition begins at the point when agency needs are established and includes the description of requirements to satisfy agency needs, solicitation and selection of sources, award of contracts, contract financing, contract performance, contract administration, and those technical and management functions directly related to the process of fulfilling agency needs by contract.

*Id.* § 2.101. More specifically, FAR § 12.302(c)'s proscription against any "solicitations or contracts" including terms "inconsistent with customary commercial practice"[7]

---

[6] CGI alternatively argues that the revised payment terms violate FASA and are illegal for unduly restricting competition. We need not reach these alternative grounds because we find that the terms violate the applicable provisions in FAR Part 12.

[7] FAR § 12.302(c) provides a limited exception to this proscription against terms inconsistent with custom-

applies to the 2014 RFQs because the RFQs are a "solicitation" and the resulting order is a "contract" as those terms are defined by FAR. FAR expressly defines a solicitation to include requests for proposals: "Solicitation means any request to submit offers or quotations to the Government. . . . Solicitations under negotiated procedures are called *'requests for proposals.'*" *Id.* § 2.101 (emphasis added). Similarly, FAR defines a "contract" as including orders: "[C]ontracts include (but are not limited to) awards and notices of awards; job orders or task letters issued under basic ordering agreements; letter contracts; *orders, such as purchase orders . . . .*" *Id.* (emphasis added). FAR § 12.302(c) thus applies, on its face, to the 2014 RFQs.

The government and the Court of Federal Claims are correct that FAR Subpart 8.4 does not explicitly state that FAR Part 12 applies to orders made pursuant to existing FSS contracts. We conclude, however, that FAR Part 12 applies to this situation expressly by its terms. To the extent there is any perceived inconsistency between FAR Subpart 8.4 and FAR Part 12, FAR Part 12 controls. 48 C.F.R. § 12.102(c) ("When a policy in another part of this chapter is inconsistent with a policy in this part, this part 12 shall take precedence.").

CONCLUSION

Because FAR Part 12 applies to the 2014 RFQs and the revised payment terms violate FAR Part 12's prohibition against including contract terms inconsistent with customary commercial practice, we *reverse* the Court of Federal Claims grant of judgment on the administrative

---

ary commercial practice if a waiver is obtained in accordance with agency procedures. 48 C.F.R. § 12.302(c). No such waiver was obtained in this case and thus that exception is not applicable here.

record to the government.  We *remand* to the Court of Federal Claims for proceedings consistent with this decision.

**REVERSED AND REMANDED**