# United States Court of Appeals for the Federal Circuit

---

**CSI AVIATION, INC.,**
*Appellant*

**v.**

**DEPARTMENT OF HOMELAND SECURITY, GENERAL SERVICES ADMINISTRATION,**
*Appellees*

---

2021-1630

---

Appeal from the Civilian Board of Contract Appeals in Nos. 6292/6386, 6543/6801, 6581/6582, Administrative Judge Kyle E. Chadwick, Administrative Judge Harold C. Kullberg, Administrative Judge Jerome M. Drummond.

---

Decided: April 14, 2022

---

JASON NICHOLAS WORKMASTER, Miller & Chevalier Chartered, Washington, DC, argued for appellant. Also represented by ELIZABETH J. CAPPIELLO, LAURA G. FERGUSON, ALEJANDRO LUIS SARRIA.

IN KYU CHO, Civil Division, Commercial Litigation Branch, United States Department of Justice, Washington, DC, argued for all appellees. Also represented by BRIAN M. BOYNTON, MARTIN F. HOCKEY, JR., PATRICIA M. MCCARTHY. Appellee Department of Homeland Security also

represented by CASSANDRA MAXIMOUS, ANDREW WAGNER, Office of the Principal Legal Advisor, United States Department of Homeland Security, Washington, DC. Appellee General Services Administration also represented by SARAH PARK, United States General Services Administration, Washington, DC.

————————————

Before NEWMAN, DYK, and HUGHES, *Circuit Judges.*

HUGHES, *Circuit Judge.*

This is a government contract case in which CSI Aviation, Inc. seeks payment from the Department of Homeland Security for flight cancellation charges, totaling $40,284,548.89, that CSI contends it is owed under the Schedule Contract. CSI appeals the decision of the Civilian Board of Contract Appeals holding that the CSI Terms and Conditions were not incorporated by reference into the Schedule Contract and dismissing six consolidated appeals on that basis. Because we determine that the Schedule Contract expressly incorporates at least one document that unambiguously identifies the CSI Terms and Conditions and that makes clear such terms and conditions apply to all operations, we reverse the Board's holding to the contrary. Since that holding formed the basis for all six dismissals, we vacate the Board's summary judgment decision and remand for further proceedings.

I

A

Under the Federal Supply Schedule Program, the General Services Administration (GSA) "acts as the contracting agent for the federal government" and negotiates "base contracts with suppliers of commercial products and services." *Sharp Elecs. Corp. v. McHugh*, 707 F.3d 1367, 1369 (Fed. Cir. 2013) (cleaned up). These base (or schedule) contracts streamline the acquisition process for federal

agencies, *see CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1352 (Fed. Cir. 2015), and "allow [them] to take advantage of the flexible and dynamic commercial market-pricing environment," so all federal customers, "regardless of size or location," can "place orders directly with contractors and receive the same services, convenience, and pricing," Appx5307.

The Federal Supply Schedule Program "closely mirrors commercial buying practices." Appx5307. But, instead of "evaluating prices head to head . . . in a competitive environment," GSA assesses pricing "as it relates to [the offeror's] commercial selling practices." Appx8775. An offeror submits a completed commercial sales practices sheet along with supporting documentation that discloses commercial pricing, market participants, sell price, and terms and conditions for the offeror's "most favored customer" in a competitive environment. Appx5367, 8775. Relying on this information and in accordance with the Federal Acquisitions Regulations (FAR), a GSA contracting officer determines whether the pricing is "fair and reasonable" not as it relates to the competitive environment but "as it relates to [the offerror's] commercial selling practices." Appx5367, 8775. Should the contracting officer accept the offer, the Federal Supply Schedule Program "allow[s] executive agencies to issue orders for those commercial products pursuant to the underlying [GSA] contract." *CGI Fed.*, 779 F.3d at 1352.

B

CSI Aviation, Inc. is a worldwide services broker that provides "passenger and cargo air charter, aircraft leasing, and comprehensive aircraft management." Appx6924. On November 6, 2008, CSI submitted an offer to GSA for a Travel Services Solutions contract under Schedule 599 for "[a]ir charter services operated by brokers, and various auxiliary services that will be used to support the contract." Appx6924. Under this contract, CSI would "provide a full

range of services to assist Government agencies in Travel Services Solutions" through "a non-mandatory, indefinite delivery - indefinite quantity Multiple Award Schedule contract that [would] allow for firm fixed-price task orders (and for labor hours and time and materials task orders based on firm-fixed prices)." Appx6924.

On February 27, 2009, in response to a revised solicitation from GSA for new air charter services, CSI submitted a revised proposal. This proposal included its commercial price list and the CSI Terms and Conditions, dated February 2009. In its March 2, 2009 response, the Contracting Officer asked CSI to provide model numbers for each aircraft offered because the provided aircraft types were "too vague to do a proper comparative price analysis." Appx9055. The Contracting Officer also acknowledged that "the CSI Terms and Conditions document [had been] submitted to [GSA]" but asked CSI if GSA was "required to initial off on these or are these requirements for ordering agencies to comply with? If so," the Contracting Officer continued, he was "going to have to submit these for Legal review as we haven't had to agree to terms like these from other air charter providers." Appx9055. CSI replied that "the Terms and Conditions . . . were just provided for [GSA's] information." Appx9581.

On March 9, 2009, the Contracting Officer "determined that CSI's offer, including the revised pricing (March 2, 2009), [was] acceptable to the Government." Appx9592. He instructed CSI to review a document that would "become the attachment to the signed cover page [Standard Form] 1449" and to "confirm that this accurately and completely addresse[d] all elements of the contract to be awarded that may not be directly addressed within the information submitted and/or agreed upon." Appx9592. CSI immediately returned "the final documents [the parties] ha[d] agreed to," including the SF1449 attachment, a final proposal letter, and the Revised Commercial Price List, all of which CSI dated March 9, 2009 to reflect the final review

date. Appx9592. GSA awarded the Schedule Contract to CSI the next day.

C

CSI's Schedule Contract includes the signed SF1449 and attached pages, Appx5277–79, together with the following documents, among others, listed in the SF1449 as being expressly "incorporated and made a part of the contract": 1) the Travel Services Solutions schedule solicitation "dated February 10, 2009, superseding the former solicitation"; 2) the Offer; and 3) the Revised Commercial Price List, Appx5279 (listing the named documents on page 1b of CSI's SF1449).

The Offer's table of contents contains a "Pricing" section that identifies four documents submitted as part of the Offer, including: "CSI Commercial Sales Practices," "CSI Pricing Policy," the Revised Commercial Price List, and "CSI Terms and Conditions (Standard Commercial Warranty)." Appx5289. The Pricing Policy includes a "Terms and Conditions" provision stating that "CSI Terms and Conditions, in other words, our Standard Commercial Warranty, will apply to all operations and are included for reference . . . . Pricing conditions are further detailed in our CSI Commercial Pricelist." Appx5516.

The Revised Commercial Price List provides the total hourly rates for Special Item Number 599-5 (air charter broker services), where the "[h]ourly prices include aircraft, crew, maintenance, insurance, fuel and domestic ground handling" and represent the highest possible hourly rate that the government could be charged. Appx5297–98. For Special Item Number 599-1000 (contract support items, and auxiliary supplies and services), the Revised Commercial Price List states: "Hourly prices do not include other charges below," referring to a bullet-point list that identifies specific taxes, fees, surcharges, and other charges that "will be determined for each requirement, if applicable." Appx5298–99 (emphasis

omitted). And "[a]ny charges will be itemized for each requirement and are subject to change in accordance with our CSI Terms and Conditions." Appx5298. The Revised Commercial Price List also includes a "Terms and Conditions" provision, which states that "CSI Terms and Conditions 02/09, or most current, will apply to all operations." Appx5299.

On February 27, 2009, CSI emailed its Commercial Price List and the CSI Terms and Conditions to the GSA Contracting Officer.[1] The CSI Terms and Conditions include a "Cancellation Charges" provision that states:

> In addition to any damages, CSI and the Air Carrier shall be entitled to recover any special out of pocket expenses actually incurred specifically, directly and solely in connection with the cancelled flights. . . . If no cancellation charges are set forth on the first page of this Agreement, then a 25% non-refundable cancellation charge will apply for up to 14 days prior to flights, and 100% cancellation charge will apply if less than 14 days prior to flights.

Appx9031.

---

[1]    CSI emailed its Commercial Price List to the GSA Contracting Officer on February 27 and then again sent its Revised Commercial Price List to the Contracting Officer on March 9, 2009. *See* Appx9024, 9592. Both versions of the price list include a "Terms and Conditions" provision, but the Revised Commercial Price List identifies the specific version of the CSI Terms and Conditions by date. *Compare* Appx9028 (Original Commercial Price List: "CSI Terms and Conditions with GSA[] will apply to all operations."), *with* Appx9599 (Revised Commercial Price List: "CSI Terms and Conditions 02/09, or most current, will apply to all operations."); *see also* Appx5299.

D

In 2014, U.S. Immigration and Customs Enforcement awarded CSI five task orders—four on March 27, 2014, and one on June 2, 2014—through the Schedule Contract for performance of removal missions out of five domestic airport hubs. Including all options and extensions, the orders' performance periods extended through June 30, 2018.

In June 2017, ICE canceled a scheduled removal flight and "CSI incurred a deposit loss of approximately $600k with [the airline provider] due to the short notice cancellation by ICE." Appx86. The ICE Contracting Officer admitted that the agency was "liable to CSI for the loss of the deposit" in accordance with "the terms of CSI's GSA contract," i.e., the Schedule Contract, and its task order with ICE. Appx86–87. The ICE Contracting Officer agreed, on behalf of the agency, to pay a cancellation fee. Appx87. The Contracting Officer acknowledged that "[t]he GSA contract [i.e., the Schedule Contract] T&Cs says, 'CSI Terms and Conditions will apply to all operations.'" Appx85. At the CO's request, CSI shared a copy of the CSI Terms and Conditions with the agency.

Then, on December 7, 2017, CSI tried to perform another removal mission—this one, to Somalia—but it was unsuccessful and returned to the United States the next day. ICE scheduled a replacement removal mission, with an estimated duration of 39.25 hours at $25,065.00 per flight hour, for December 20, 2017. But, on December 19, 2017, the scheduled flight's passengers successfully obtained a temporary restraining order enjoining ICE from removing them. ICE immediately informed CSI and canceled the scheduled flight. Consequently, CSI invoiced ICE for the total estimated amount for the cancelled removal mission to Somalia, totaling $983,801.25. And, on February 7, 2018, the ICE Contracting Officer "reject[ed] the invoice in full because the services were not provided and no flight hours were flown." Appx121.

1

On November 30, 2018, CSI submitted a certified claim to the GSA CO[2] for payment of the invoice amount. The Contracting Officer found that the "Schedule Contract had incorporated the CSI Terms and Conditions, including a cancellation clause, providing that a 100% cancellation charge would apply if the cancellation occurred within fourteen (14) days of a scheduled flight." Appx10185. But the Contracting Officer concluded that it could not grant the relief CSI sought since "GSA does not have the authority to grant the monetary relief . . . as [it has] no authority to either pay the liability of another agency or order ICE to pay any amounts that may be owed." Appx10185.

CSI submitted another certified claim to the GSA Contracting Officer on April 26, 2019, this time for payment of 45 overdue invoices tendered between December 14, 2018, and February 7, 2019. *See* Appx1326–29 (listing the invoices, corresponding task orders, amounts due, and pertinent dates for each invoice). "The amounts [c]laimed in all the [i]nvoices, collectively totaling $40,284,548.89, equal the sum value of dozens of aircraft transportation charters . . . purchased by ICE and subsequently cancelled by ICE less than 14 days before the flights were performed." Appx1322. While the Contracting Officer again found that

---

[2]    CSI also submitted a certified claim for payment of the same invoice to the ICE Contracting Officer on July 25, 2018. But only the GSA Contracting Officer can resolve a contractor's claims that involve any contract interpretation dispute associated with the Schedule Contract. *See Sharp Elecs. Corp. v. McHugh*, 707 F.3d 1367, 1373 (Fed. Cir. 2013) ("[W]e conclude that the FAR creates a bright-line rule—all disputes requiring interpretation of the schedule contract go to the schedule CO, even if those disputes also require interpretation of the [agency task] order, or involve issues of performance under the [task] order.").

the CSI Terms and Conditions were "incorporated into the contract," it also found that the cancellation charges, "located within [the CSI] Terms and Conditions, [were] directly in conflict with the FAR 52.212-4(l) Termination for the Government's Convenience [C]lause (hereinafter 'Termination Clause'), which is required in all GSA [schedule] contracts." Appx10192 (footnote omitted). The Contracting Officer explained that since the CSI Terms and Conditions "were an attachment to the contract buried within its 2008 offer submission," the incorporated document "fall[s] to the eighth level . . . when establishing precedence." Appx10193. The Contracting Officer decided that the "Termination Clause takes precedence over CSI's Commercial Terms and Conditions, and, particularly, its Cancellation Charges." Appx10192–93.

2

CSI appealed the Contracting Officer's decisions to the Board and the Board found, on summary judgment, that the Schedule Contract did not incorporate the CSI Terms and Conditions by reference. The Board saw "at least three problems with CSI's arguments in favor of incorporation." Appx8.

First, the Board found significant the fact that the SF1449 expressly "incorporated and made part of the contract" a list of six documents and that "the CSI Terms and Conditions never appeared in that list." Appx8. The Board faulted CSI for not using such express incorporation language for the CSI Terms and Conditions. Second, the Board found that the phrase "will apply to all operations," used in the Commercial Price List to refer to the CSI Terms and Conditions, was "not the type of phrase that should be read as expressly incorporating fully into the contract some extrinsic text containing additional contract terms." Appx9 (cleaned up) (quoting *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1347 (Fed. Cir. 2008)). In the Board's view, "these first two flaws . . . suffice to show

that the CSI Terms and Conditions were not incorporated in the schedule contract." Appx9. Still, the Board identified a third flaw that, it believed, also rendered CSI's position unavailing: "the residual 'ambiguity about the identity of the document being referenced.'" Appx10 (quoting *Northrop*, 535 F.3d at 1344). There was "nothing in the text of the schedule contract" by which the Board "could . . . locate without doubt the 'most current' version of the CSI Terms and Conditions at any junction from March 2009 to 2019." Appx10.

The Board granted the government's summary judgment motion on January 4, 2021, after concluding that the Schedule Contract did not incorporate the CSI Terms and Conditions. The parties then filed a joint motion on January 27, 2021, stating "that they agree that the Board's January 4, 2021[] decision on a contract interpretation issue common to [CSI's] six appeals suffices to support denying the appeals" and asking the Board "to consolidate the appeals for the purpose of issuing one final and appealable decision." Appx13. The next day, the Board granted the motion, consolidated the six appeals, and denied those appeals based on its January 4, 2021 decision.

CSI timely appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(10).

## II

The issue on appeal is whether the CSI Terms and Conditions are incorporated into the Schedule Contract by reference. This is a question of law we review de novo. *Northrop*, 535 F.3d at 1343.

## A

Incorporation by reference "provides a method for integrating material from various documents into a host document . . . by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein." *Zenon*

*Env't, Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1378 (Fed. Cir. 2007) (alteration in original) (citation omitted). To incorporate material by reference, "the incorporating contract must use language that is *express* and *clear*, so as to leave no ambiguity about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract." *Northrop*, 535 F.3d at 1344. Said differently, "the language used in a contract to incorporate extrinsic material by reference must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history)." *Id.* at 1345; *see also Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) (A "mere *reference* to another [document] is not an *incorporation* of anything therein." (citation omitted)).

Here, the Schedule Contract incorporates the Offer submitted by CSI during contract negotiations. Neither party disputes that this document was "made a part of the contract." Appx5279. Rather, they disagree as to whether the Offer uses sufficient language to incorporate the CSI Terms and Conditions into the Schedule Contract by reference. We conclude that it does.

The Offer plainly identifies the CSI Terms and Conditions—along with the CSI Commercial Sales Practice attachment, its Pricing Policy, and its Commercial Price List—in the "Pricing" section of its table of contents. Appx5289. And the Offer's Pricing Policy contains a "Terms and Conditions" provision that expressly states, "CSI Terms and Conditions . . . will apply to all operations and are included for reference." Appx5516. True to its word, a copy of the CSI Terms and Conditions, dated November 2008, is included as part of the Offer. *See* Appx5525–27. Thus, the Offer makes clear the identity of the document

being referenced: the document titled "CSI Terms and Conditions." And, as evidenced by the "Terms and Conditions" provision in the Offer's Pricing Policy—which expressly employs "will apply to all operations" language—the referenced CSI Terms and Conditions apply to at least CSI's pricing terms. *Apply*, Black's Law Dictionary (11th ed. 2019) (defining "apply" to mean "[t]o employ for a limited purpose" or "[t]o put to use with a particular subject matter"). We accordingly hold that the Offer uses sufficiently clear and express language to establish the identity of the document being referenced and to incorporate the CSI Terms and Conditions into the Schedule Contract by reference.

B

In addition, none of the "flaws" the Board identified otherwise provides a proper basis for its decision holding that the Schedule Contract does not incorporate the CSI Terms and Conditions by reference. *See* Appx8–10.

First, the Board placed too much weight on the fact that the Schedule Contract includes express language to incorporate some documents—like the Offer—and erroneously faulted CSI for not "us[ing] the same or similar language" to incorporate the CSI Terms and Conditions into the contract. Appx8. The Board reasoned that CSI's use of such language to incorporate some documents "demonstrate[d] that the parties were familiar with language of incorporation and likely would have used the same or similar language had there been an intention to incorporate [the CSI Terms and Conditions] into the contract." Appx8 (cleaned up). In the Board's view, the absence of such incorporation language "*at least* raises doubt about whether they intended to incorporate the CSI Terms and Conditions." Appx8–9. But while the parties' use of explicit incorporation by reference language conveys familiarity with contract language of incorporation, "[o]ur circuit . . . does not require 'magic words' of reference or of incorporation,"

*Northrop*, 535 F.3d at 1346, and the Board offers no basis for why it relies on this as one of two dispositive reasons for finding no incorporation by reference. Indeed, even in *Northrop*, the opinion on which the Board relies, we treated the parties' familiarity with language of incorporation as a mere footnote that bolstered our independently established conclusion. *Id.* at 1347 n.1.

Second, the Board improperly determined that the "will apply to all operations" language—used to incorporate the CSI Terms and Conditions into the Schedule Contract—was "not the type of phrase that should be read as expressly incorporating fully into the contract some extrinsic text containing additional contract terms.'" Appx9 (cleaned up). According to the Board, "[n]o language in the price list advises a reader to consult any other document to find additional prices, and 'all operations' does not unambiguously mean 'all other pricing issues.'" Appx9. The Board said that "[i]t *could* mean that, but it could alternatively refer to something else, such as logistical operations." Appx9. The Board, however, offered no basis for its decision. It asserted only that it had "already ruled that this [language] was ambiguous" and that it saw "no reason to change [its] view." Appx9. But the Board had never made such a ruling. It had found merely that the "all operations" language did "not *unambiguously* mean 'all other pricing issues,'" and it had suggested that "it could alternatively refer to something else, such as logistical operations." Appx9 (quoting Appx20). Indeed, the Board had expressly observed that it could not "interpret what the commercial price list may say about terminating or cancelling an order *without learning more about the context of the contract language.*" Appx20–21 (emphasis added). Yet in its later decision now on appeal, the Board disregarded any such context. This was error. And when we consider such "context" here, it becomes clear that the Board's suggestion—that "all operations" could alternatively refer to "logistical operations"—is not a reasonable one. That an

interpretation of a contract term "is conceivable[] does not necessarily render that [term] ambiguous." *Cmty. Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993).

Third, the Board found that "CSI still could not prevail, due to the residual 'ambiguity about the identity of the document being referenced,'" describing the CSI Terms and Conditions as "a moving target or, to be more charitable, a living document." Appx9–10 (citation omitted). The Board faulted CSI for "choosing not to reveal the 'most current' version of the CSI Terms and Conditions to the Government on a continuous basis" and concluded that, as a result, "CSI created 'ambiguity about the identity of the document being referenced' and defeated its own aim." Appx11. We cannot agree. The language the Board refers to here derives from the Revised Commercial Price List's "Terms and Conditions" provision: "CSI Terms and Conditions 02/09, or most current, will apply to all operations." Appx5299. Even if there is a dispute as to which version controls, resolving that dispute is not relevant to deciding the question before us: whether any version was incorporated into the contract by reference.[3] The proper inquiry is

---

[3] We find problematic the Board's seeming presumptions that there are uncountable versions of the CSI Terms and Conditions between 2009 and 2019 and that all such versions are pertinent to the parties' contract dispute. In our view, the Board's resolution should account for the effective date of the Schedule Contract, March 10, 2009.

Replacing conjecture with record evidence, we note that there are only two relevant versions of the CSI Terms and Conditions found in the record: one dated November 2008, the other February 2009, and both dated before the contract's effective date. These versions include identical language addressing cancellation charges. *Compare*

whether the Schedule Contract employs express and clear language, "so as to leave no ambiguity about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract." *Northrop*, 535 F.3d at 1344.

The Board unreasonably strained to find ambiguity regarding the identity of the referenced document. The Offer expressly identifies the document titled "CSI Terms and Conditions" and unambiguously states that such document will apply to all operations. The Offer's incorporation language, found in its Pricing Policy's "Terms and Conditions" provision, refers to the "CSI Terms and Conditions" document that was also included as part of the Offer.

## III

Because the Schedule Contract, through the incorporated Offer, unambiguously identifies the CSI Terms and Conditions and specifies that such terms and conditions will apply to all operations, we hold that the Schedule Contract incorporates the CSI Terms and Conditions by reference. We therefore reverse the Board's holding to the contrary. And since the Board's holding was the basis for its decision to grant summary judgment and dismiss six consolidated appeals, we vacate that decision and remand for further proceedings. In doing so, we do not foreclose the

---

Appx5527 ¶ 16(C) (November 2008 version: "[A] 25% non-refundable cancellation charge will apply for up to 14 days prior to flights, and 100% cancellation charge will apply if less than 14 days prior to flights."), *with* Appx9031 ¶ 16(C) (February 2009 version: "[A] 25% non-refundable cancellation charge will apply for up to 14 days prior to flights, and 100% cancellation charge will apply if less than 14 days prior to flights."). We see no basis for the Board to unreasonably strain to find ambiguity between identical copies of the cancellation charges provision.

possibility of finding the CSI Terms and Conditions inapplicable for some other reason or that the cancellation provision is inconsistent with other provisions in the contract, such as the Termination Clause, but we leave any such possibility for the parties to raise and the Board to decide on remand.

### VACATED IN PART, REVERSED IN PART, AND REMANDED

COSTS

No costs.