ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -                                        )
                                                   )
GSI Pacific, Inc.                                  )          ASBCA No. 63520
                                                   )
Under Contract No. W9128A-17-C-0004                )

APPEARANCES FOR THE APPELLANT:          Marisa M. Bavand, Esq.
                                        Emily A. Yoshiwara, Esq.
                                          Dorsey & Whitney LLP
                                          Seattle, WA

APPEARANCES FOR THE GOVERNMENT:         Michael P. Goodman, Esq.
                                          Engineer Chief Trial Attorney
                                        Jonathan A. Swanson, Esq.
                                        Jacob N. Haddad, Esq.
                                          Engineer Trial Attorneys
                                          U.S. Army Engineer District, Honolulu

OPINION BY ADMINISTRATIVE JUDGE O'CONNELL ON THE
PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

The parties have cross moved for summary judgment in this dispute concerning the scope of work required by a contract to remove and dispose of munitions and explosives left on a site on the Big Island of Hawaii. The Board grants the motions in part and denies them in part.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

The following facts are undisputed or uncontroverted, except as noted.

1. This appeal involves a site referred to as the Area M Munitions Response Site, which consists of 5,074 acres on the northwest side of the island of Hawaii. Area M is located south of the former Lalamilo Firing Range and contained military munitions. (R4, tab C-001 at 009 (hereinafter "C-1 at 9"), tab C-2 at 6)

2. The United States Army Corps of Engineers (USACE) previously awarded contracts for the removal of munitions in Area M starting in the northern portion and moving south. These contracts cleared just over half the site, or 2,635.7 acres. During those removals the contractors removed a variety of munitions from the ground surface and subsurface. (R4, tab C-1 at 13-14, tab C-2 at 6)

3. USACE conducted a Feasibility Study to evaluate remedial alternatives for the remaining portion of Area M and issued a report in September 2015. The Feasibility Study resulted in the identification of four remediation alternatives. (USACE resp. to app. statement of undisputed material facts (ASUMF) ¶¶ 9, 12; app. supp. R4, tab 6).

4. On March 16, 2017, after a public comment period, USACE issued a Decision Document which described the four alternatives from the Feasibility Study, including Alternative 3, which was entitled "Surface and Subsurface Munitions Removal (Uninvestigated Areas-Unobstructed) and Land Use Controls (Entire MRS [Munitions Response Site])" (R4, tab C-1 at 32-33, 35-36). The Decision Document stated that USACE had selected Alternative 3 (*id.* at 38).

5. USACE had contemplated awarding a contract to clear all remaining areas in Area M. However, due to funding limitations, USACE proceeded with the remediation of 850 acres. The contract described the location of the 850 acres as a "sliver along the western boundary of Area M," and an area extending from the southern border of the previously cleared area. (R4, tab C-2 at 7, 26)

6. USACE awarded the above-captioned contract to appellant, GSI Pacific, Inc. (GSI) for $4,596,660.98, on July 17, 2017 (R4, tab C-2 at 1). The contract stated that the objective was to remove and dispose of munitions and explosives of concern in the 850 acre-site to reduce the risk to human health and the environment (*id.* at 5).

7. On September 28, 2019, the parties entered a bilateral modification with no change in price to reduce the acres cleared to "650 acres by analog method and approximately 50 acres by Digital Geophysical Methods" (R4, tab C-5 at 1, 4). Analog remediation means that the contractor uses a metal detector (compl. ¶ 19; R4, tab D-9 at 2).[1]

*Facts Related to Whether the Contract Required Removal in Both the Surface and Subsurface Areas*

8. Section 4.5, Task 5, of the contract (Perform MEC [munitions and explosives of concern] Remedial Action at Area M-Project 7 (850 acres)), described the work as follows:

---

[1] Although not necessary to decide the pending motions, we note that the government represented to the Board at a February 28, 2025, status conference that Digital Geophysical Methods refers to what is essentially a more sophisticated metal detector (Bd. memo. of conf. call dtd. February 28, 2025).

> The Contractor shall supply all personnel, tools, equipment, communications, transportation, materials, and supervision to integrate, manage, and safely execute the destruction and/or disposal of MEC and MD [munitions debris] at portions of Area M as specified in section 3.1.3 of this PWS.  Subsurface removal shall be to a depth of detection of the instrument . . . .

(R4, tab C-2 at 13)

9.  Section 3, Background and History, stated at section 3.1.3 that USACE had conducted a "Remedial Investigation/Feasibility Study (RI/FS)" and that the "RI/FS effort resulted in a Decision Document" (*id.* at 6-7).

10.  Section 3.1.3.1 described the approved alternative 3 in the Decision Document as:  "Surface and subsurface munitions removal at 2,438.3 acres . . ." (*id.* at 7).

11.  Section 4.5.4, MEC Accountability, provided "[t]he Contractor shall maintain a detailed accounting of all MEC and MEC components encountered . . . to include . . . location and depth of MEC. . ." (*id.* at 14).

12.  GSI contends that the contract required subsurface removal in less than 10 acres of the site.  The contract does not state this, but GSI relies upon the Decision Document and the Feasibility Study for its contention (*e.g.*, ASUMF ¶¶ 34-35 (disputed by USACE)).

13.  The contract references both the Feasibility Study and the Decision Document but treats them somewhat differently.  With respect to the former, the contract merely states in the "Background and History" section, that USACE conducted a "Remedial Investigation/Feasibility Study" that "resulted in a Decision Document" (R4, tab C-2 at 6-7).

14.  With respect to the Decision Document, the Section 1 of the contract affirmatively states that the "work is to be performed in accordance with" the Decision Document (*id.* at 5).

*The Decision Document*

15. GSI calls our attention to a statement in the Decision Document that describes the selected Alternative 3:

> Under Alternative 3, a remedial action to cleanup surface and subsurface munitions would be performed in Uninvestigated Areas that are not obstructed by pavement or structures (2,436.3 acres). In areas where the rugged 'a'a lava is present with minimal cover soil, this alternative would <u>primarily be a surface removal</u>. However, various cracks and crevices are present in the 'a'a lava's areas. It is possible for MEC to be present in deeper cracks and crevices, which may be beyond the depth of detection of the instrument.

(R4, tab C-1 at 32) (emphasis added)

16. The Decision Document also contains information about the geology of Area M as follows:

> The northern areas of Area M are comprised of the Hāpuna-Waikui-Lālāmilo complex, a very cobbly medial silt loam formed in volcanic ash with 20-in to 40-in thick deposits typically overlaying fragmented 'a'a lava. The soil types in the southern portions of Area M where the relatively recent 'a'a lava flows are present are classified as lava flow or extremely cobbly sand. Slopes range from 2 to 20%. The southern areas of Area M are classified as <u>very stony lands, consisting of very scattered patches (less than 1%) of shallow soil material and a high proportion of a`a lava</u> outcrops which result in a very rugged terrain. In most areas, there is no soil cover and the outcrops are bare of vegetation, except for mosses, lichens, ferns, and a few small ohia trees.

(*Id.* at 25) (emphasis added)

17.  USACE draws our attention to the Decision Document's repeated characterization of the work as surface and subsurface remediation.  Some examples include:

- "The selected remedy for the Area M MRS is Surface and Subsurface Munitions Removal (Uninvestigated Areas - Unobstructed) and Land Use Controls <u>for the entire MRS acreage</u>" (R4, tab C-1 at 10) (emphasis added).

- "The selected remedy for the Area M MRS is the removal of surface and subsurface munitions in the areas of the [site] that have not been previously had [sic] a response action and are not obstructed . . . <u>for the entire MRS </u>" (*id.* at 14) (emphasis added).

- "The selected remedy includes a cleanup of detected surface and subsurface munitions in the uninvestigated areas which are not covered by pavement or structures (2,436.3 acres) . . . across the entire Area M MRS . . ." (*id.* at 39).

*The Feasibility Study*

18.  GSI also relies upon statements in the Feasibility Study.  Thus, it draws our attention to a statement in the Feasibility Study that describes the selected Alternative 3:

> This alternative will include a surface and subsurface removal of MEC from within the entire 2,455.1 acres identified as Uninvestigated Areas . . . . The area was revisited by [remedial investigation] field teams and deemed accessible, but the very minimal amount of soil present required surface clearance only.  There are a few scattered patches of subsurface soil present.  Since these areas comprise such a small portion of the site, they are grouped with the surface MEC removal alternative.  <u>The acreage is estimated to be 1% of the entire acreage for cost estimation</u>.

(App. supp. R4, tab 6 at 83) (emphasis added)

5

19. GSI relies upon a table in the Feasibility Study summarizing the four remedial alternatives. In summarizing the selected alternative 3, the table states:

| Alternative | Description of Alternative |
|---|---|
| * * * | * * * |
| 3 –Surface MEC Removal . . . (Subsurface MEC removal in areas with soil present. Estimated to be 0.1%) | Full Surface MEC Removal of all Uninvestigated Areas with no physical obstruction and are accessible. |

(App. supp. R4, tab 6 at 86)

20. GSI also cites Appendix B to the Feasibility Study entitled "Cost Estimates" (app. supp. R4, tab 7). A spreadsheet containing a cost estimate for alternative 3 states "[a] surface clearance of all uncleared areas not covered by pavement or structures. Assume Surface (99% at 3 acres/day) and minor Subsurface (estimated 1% maximum at 0.75 acres/day)" (*id.* at 78) (emphasis in original).

*Facts Related to Seeding Requirements*

21. The parties agree that the contract provided for the monitoring of the effectiveness of GSI's removal operation by the placement of seeds, which are small metal objects that resemble munitions found in the area. The seeds placed by GSI were referred to as quality control seeds and those placed by USACE as quality assurance seeds. (App. resp. to respondent's statement of undisputed material facts (RSUMF) ¶¶ 55-56)

22. The contract provided that USACE would perform quality assurance checks of all phases of GSI's work. It required GSI to perform another sweep of areas that failed the quality assurance check, providing: "[i]f any ferrous object is found that is similar in size and mass to the MEC [munitions and explosives of concern] expected in that area, within the depth of detection, that grid will be failed, and shall be completely re-swept by the Contractor at no cost to the Government." (R4, tab C-2 at 14)

23. The contract required GSI to prepare a quality assurance project plan (*id.* at 9).

24. In December 2017, GSI submitted a draft of its quality assurance project plan (Haddad decl., ex. O).

6

25. USACE provided the following comment on GSI's quality assurance project plan:

> You state you will bury detection seeds to a maximum of 90% depth of detection. According to EM-200-1-15 "Detection and recovery must be demonstrated consistently for the hard to detect items; therefore, seed items (e.g., ISOs) that are representative of the largest expected MEC and the smallest expected MEC shall be placed between 95% and 100% of their respective maximum consistent detection depth." Adjust the depth you will place your seed items.

(*Id.* at 2)

26. In response, GSI wrote "Concur . . . paragraph has been revised to read 'Seeds will be placed at 95% to 100% of their respective maximum consistent detection depth . . .'" (*id.*).[2]

*Facts Related to Right-of-Entry on Private Property*

27. The contract provided:

> 7.4 RIGHTS-OF ENTRY (ROE)
> The Government will be responsible for obtaining signed ROE from private landowners in Area M. However, the Contractor shall comply with all applicable terms and conditions negotiated by the Government with third-party landowners and/or property interest holders (e.g., a lessee or easement holder) to gain access to the FUDS Project site to conduct field work, including but not limited to naming the landowner and/or property interest holder as additional insureds on the Contractor's liability insurance policy or policies.

(R4, tab C-2 at 19)

---

[2] GSI states "Disputed" in response to USACE's findings of fact concerning this document (app. resp. to RSUMF ¶¶ 63-64). However, we do not understand GSI to be disputing what the document states but rather the interpretation. GSI does not dispute that the final version of its quality assurance project plan provided for removal of seeds at 95% to 100% of their respective maximum consistent detection depth (app. resp. to RSUMF ¶ 72).

28. It is undisputed that USACE obtained all necessary rights-of-entry required by the contract (app. resp. to RSUMF ¶ 74).

*The REA and Certified Claim*

29. GSI submitted a request for equitable adjustment (REA) dated December 29, 2020, seeking an additional $4,511,682.37 (R4, tab D-9). Neither party has referred us to a decision on this REA.

30. On February 9, 2022, GSI submitted a certified claim seeking a slightly higher amount, $4,530,424.76 (R4, tab D-10). GSI contended that USACE directed it to perform a surface and subsurface sweep of the entire site even though the contract, in GSI's view, required a surface and subsurface sweep only on the "9.88 acre sand/soil portion of the site" (*id.* at 5). It is not clear where this 9.88-acre number comes from. Counsel for GSI informed the Board during a February 28, 2025, conference call that this was GSI's estimate/calculation of the sand/soil portion of the site (Bd. memo. of conf. call dtd. February 28, 2025). USACE states that no documents it provided to GSI contained such a number, and it accuses GSI of having "fabricated" the number (gov't resp. to ASUMF ¶ 35).

31. For purposes of the motion, the Board will state that it is unclear and disputed as to how much of the 850 acres was sand/soil and how much was ʻaʻa lava. The description of the geology in the Decision Document as containing loam in the "northern areas" and ʻaʻa lava in the "southern areas" (SOF ¶ 16) is less than precise. Viewing the project site on a map, one could describe the bulk of the project site as being located in the northern part of the southern half of Area M, but it also included some land in the northwest corner (R4, tab C-2 at 26). USACE contends that the lava is denser in the more than 1,000 acres of Area M that lie south of the project site (gov't resp. to ASUMF ¶ 15).

32. GSI also alleged in the claim that it had performed extra work because it had been forced to search for 37-mm projectiles over the entire site (R4, tab D-10 at 9); that USACE had enforced unattainable quality standards for placement of QA seeds (*id.* at 7); and that it had to place QC seeds below the ground surface throughout the entire site (*id.* at 7-8).

33. Finally, GSI also alleged in the claim that it had to coordinate access issues with private landowners and that those landowners repeatedly blocked GSI from entering the site either by locking the access gates or placing physical barriers across the entry point or, during the digital geophysical mapping portion of the work, the landowners had not adequately cleared the site of equipment and other materials (*id.* at 8-9).

34. The contracting officer (CO) denied the claim by a written decision dated December 5, 2022 (R4, tab B-1).

35. GSI filed a timely appeal on January 25, 2023.

*The Pending Cross-Motions*

36. The dispute concerning subsurface remediation is clear at a basic level: GSI contends that the contract required subsurface removal at less than 10 acres of the site, and USACE contends that it was required in all 850 acres. It is less clear how that played out during the project. After reading the cross-motions, the Board was left wondering what subsurface remediation entails in areas that the contract refers to as 'a'a lava but, in reality, is a type of rock. For example, was the contractor expected to locate munitions that were buried under lava flows (which are now solid rock)? GSI's proposed facts state only that USACE "demanded that GSIP perform subsurface remediation" (ASUMF ¶ 45) and that this "greatly impacted GSIP" (ASUMF ¶ 46).

37. In its opposition to USACE's cross-motion, GSI went into slightly more detail, identifying the problem as the seeding requirements. It contended that "subsurface seeding (which was performed) required placing seeds in deep crevices, and under lava/rocks – in essence burying the seeds in the lava rock" and that it "did not anticipate having to perform subsurface seeding." GSI further stated: "[g]iven the rocky terrain and deep crevices, subsurface seeds were considerably more time consuming to find, and when a seed was missed GSIP had to re-sweep the entire lot." (App. resp. at 15)

38. The Board conducted two conference calls with the parties attempting to identify the extra work that GSI alleges it was required to do. After the second conference call, the Board thought that it had identified two allegations that generally seem to be consistent with the GSI's contention at page 15 of its opposition brief. As stated in the Board's memorandum of the second conference call:

> The Board asked the parties to clarify the nature of the dispute concerning the placement of seeds. Counsel for both parties agreed that the dispute concerns the placement of seeds in cracks and crevices of the a'a' lava, and the placement of seeds under piles of rocks.

(Bd. memo. of conf. call dtd. February 28, 2025)

9

39. The government filed a response, indicating its general agreement with this statement but asking the Board to add that the government contended that placement of the seeds in cracks and crevices was not beyond the scope of the contract (gov't status rpt. dtd. March 5, 2025).

40. GSI filed a response that proposed the deletion of the Board's summary of the two discrete types of extra work and asked that it be replaced with the following:

> GSIP contends that the issue of how seeds were to be placed is dependent on whether the contract requires surface vs. subsurface seeding. Seed placement should differ depending on whether the contract scope required surface or subsurface removal. If the contract required a primarily surface removal, then the seeds should have only been required to be placed on the surface of the a'a' lava terrain. If the contract required subsurface removal in the a'a' lava terrain, then the seeds could have been buried or placed in cracks or crevices. GSIP believes a question of fact then exists as to what specifically that means for the placement of seeds and what was actually performed. There has been limited evidence submitted as to what seeding methods actually employed on the Project. GSIP maintains that this is a question of fact for the parties to present evidence of in the future.

(App. status rpt. dtd. March 6, 2025)

DECISION

I.      *Summary Judgment Standards*

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (citing FED. R. CIV. P. 56(c)). When considering a motion for summary judgment, the Board's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Id.* at 249. Conclusory statements and mere denials are not sufficient to ward off summary judgment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). The fact that both parties have moved for summary judgment does not mean that the Board must grant judgment as a matter of law for one side or the other. Rather, the Board must evaluate each party's motion on

10

its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration. *Id.* at 1391.

II.       *The Pending Cross-Motions*

The government has filed a motion for summary judgment on all aspects of GSI's claim. GSI has filed a motion for partial summary judgment on what it describes as a "specific issue: what work was required under" the contract (app. mot. at 1). GSI states in its reply brief that "the fundamental question before the Board is what constitutes the Contract . . ." (app. reply at 2). Specifically, GSI contends that both the Decision Document and the Feasibility Study are incorporated in the contract while USACE contends that neither are incorporated. The Board agrees that this is the appropriate place to start our analysis.

A. *The Contract Incorporated the Decision Document*

The Court of Appeals for the Federal Circuit has held that "the language used in a contract to incorporate extrinsic material by reference must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract . . . ." *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1345 (Fed. Cir. 2008). The court contrasted incorporated materials with those that are "merely … relevant to the contract" such as "background law or negotiating history." *Id.* The "requirement that contract language be explicit or otherwise clear and precise does not amount to a rule that contracting parties must use a rote phrase or a formalistic template to effect an incorporation by reference." *Id.* Thus, no "magic words" are required to incorporate a document. *Id.* at 1346.

The Federal Circuit's decision in *CSI Aviation, Inc. v. Dep't of Homeland Sec.*, 31 F.4th 1349 (Fed. Cir. 2022), is instructive. In that case, a contractor submitted an offer to the agency. The parties later executed a contract that listed documents that were "incorporated and made a part of the contract," including the solicitation and the offer. The list of incorporated documents did not include the contractor's terms and conditions. *Id.* at 1352. A dispute later arose as to whether those terms and conditions had been incorporated in the contract. The Court held that they were. The Court relied upon the offer's table of contents, which listed documents that were submitted as part of the offer, including the contractor's terms and conditions. *Id.* at 1352, 1355. The offer's table of contents also listed the contractor's Pricing Policy, which stated the contractor's "Terms and Conditions . . . will apply to all operations and are included for reference." *Id.* The Court held that the offer "use[d] sufficiently clear and express language to establish the identity of the document being referenced and to incorporate the CSI Terms and Conditions into the Schedule Contract by reference." *Id.* at 1355.

11

In this appeal, there is no dispute that the contract refers to the March 16, 2017, Decision Document. The only question is whether the contract clearly communicated an intent to incorporate the Decision Document. We conclude that it did. We hold that the language in the contract providing that the "work is to be performed in accordance with" the Decision Document (SOF ¶ 14) is comparable to the language in *CSI Aviation* providing that the terms and conditions at issue "will apply to all operations . . . ." *CSI Aviation*, 31 F.4th at 1355. Indeed, we can think of no other meaning of the phrase that the "work is to be performed in accordance with" the Decision Document other than that the contractor was bound to follow it as if it were an express provision of the contract. The government offers no plausible alternative interpretation.

B. *The Feasibility Study is not Incorporated in the Contract*

We come to the opposite conclusion with respect to the Feasibility Study because there is no language in the contract that clearly conveys an intent to incorporate that document. The only substantive references to the Feasibility Study are in a section of the contract titled "Background and History" and those references convey nothing more than that USACE conducted the Feasibility Study and that the process resulted in a Decision Document issued about 1.5 years after the Feasibility Study (SOF ¶ 13). There is no language in the contract concerning the Feasibility Study that is comparable to the requirement that the "work is to be performed in accordance with" the Decision Document.

GSI relies upon the language in contract section 4.5 that required GSI: "to integrate, manage, and safely execute the destruction and/or disposal of MEC and MD at portions of Area M <u>as specified in section 3.1.3</u> of this [contract]" (SOF ¶ 8) (emphasis added). GSI essentially contends that the phrase "as specified in section 3.1.3," combined with the fact that the Feasibility Study is mentioned in section 3.1.3 is enough to incorporate that document in the contract. The Board disagrees. We believe that the most logical interpretation of the phrase "at portions of Area M as specified in section 3.1.3" simply means that the work is to be performed in the portions of Area M discussed in section 3.1.3, that is, in the parts of Area M that that had not been remediated. Moreover, this does not change our central point that section 3.1.3 mentions the Feasibility Study only by way of background. By contrast, section 1 of the contract contains language clearly conveying an intent to incorporate the Decision Document, but section 1 does not mention the Feasibility Study.

Accordingly, we hold that the Feasibility Study is a document that may be relevant to the contract by way of background, but it is not part of the contract. *Northrop Grumman*, 535 F.3d at 1345; *CSI Aviation*, 31 F.4th at 1355 (quoting *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) (A "mere

12

reference to another [document] is not an incorporation of anything therein.") (citation omitted)).[3]

C. *The Consequences of Incorporating the Decision Document but not the Feasibility Study*

Contract interpretation begins with the language of the written agreement. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993)). When interpreting the contract, the document must be considered as a whole and interpreted to harmonize and give reasonable meaning to all of its parts. *Id.* (citing *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434-35 (Fed. Cir. 1996)). An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous. *Id.* (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).

Because the Feasibility Study is not part of the contract, we will only consider whether we can harmonize and give reasonable meaning to the contract and the Decision Document. As we have already described, the contract contained no indication that anything less than 850 acres of surface and subsurface remediation was required (and later 650 acres by analog method and approximately 50 acres by Digital Geophysical Methods) (SOF ¶¶ 7, 12). Similarly, the Decision Document contains repeated references to surface and subsurface remediation across the entire site (SOF ¶ 17). The question then is whether there is any language in either document that leads to a different conclusion.

There is no dispute that the contract required GSI to perform subsurface removal in areas of sand/soil. As discussed above, the Decision Document generally describes the northern areas of Area M as containing loam and the southern areas as containing 'a'a lava (SOF ¶ 16). However, the terms "northern areas" and "southern areas" are imprecise and at this time we cannot verify GSI's assertion that there were only 9.88 acres of sand/soil (SOF ¶¶ 16, 31). To the extent that the cross-motions address the issue of whether there were exactly 9.88 acres of sand/soil, there are disputed facts, and that aspect of the motions is denied.

---

[3] Whether a document has been incorporated in a contract is a question of law. *Northrop Grumman*, 535 F.3d at 1343. We acknowledge that GSI has submitted excerpts of deposition testimony from government witnesses opining which documents have been incorporated in the contract (*e.g.*, app. reply at 7-13). Because our review is *de novo* and we are deciding a legal issue, we find this testimony to be unhelpful.

This brings us to one of the key issues in dispute. In areas where there was 'a'a lava, did the contract require GSI to do something more than surface removal? The language in the Decision Document that GSI relies on states:

> Under Alternative 3, a remedial action to cleanup surface and subsurface munitions would be performed in Uninvestigated Areas that are not obstructed by pavement or structures (2,436.3 acres). In areas where the rugged 'a'a lava is present with minimal cover soil, this alternative would primarily be a surface removal. However, various cracks and crevices are present in the 'a'a lava's areas. It is possible for MEC to be present in deeper cracks and crevices, which may be beyond the depth of detection of the instrument.

(SOF ¶ 15)

The meaning of this language is clear. The first sentence speaks of surface and subsurface removal on the site. The second sentence states that in areas where the 'a'a lava is present the remediation "would primarily be a surface removal." The key word in this sentence is "primarily" because it conveys that, while the work would be mainly or chiefly surface removal, there would be some subsurface removal.[4] The third and fourth sentences identify the nature of the subsurface removal. By speaking of munitions and explosives entering the cracks and crevices of the 'a'a lava and referring to the depth of detection of the metal detector, this conveys a clear need for the contractor to remove those munitions and explosives that are within the depth of detection of the metal detector. Harmonizing this with the rest of the contract, the Board interprets the contract to mean that the entire 850-acre site requires subsurface removal to the extent that there are cracks and crevices in the 'a'a lava. But the contract does not require the contractor to locate and remove munitions that are buried in solid rock, nor are we aware of any allegation that USACE required this.

Neither party offers any persuasive arguments for an alternate interpretation of this paragraph. GSI focuses exclusively on the second sentence stating that the removal in the 'a'a lava areas would be "primarily" a surface removal. But it offers no explanation as to why the sentences that follow speak of the munitions and explosives entering the cracks and crevices of the 'a'a lava if the intent was not for the contractor to remove those items. Instead, GSI conflates the "primarily" sentence with other contract language indicating that there are only small pockets of soil (*e.g.*, SOF ¶ 16),

---

[4] The Board notes that, while GSI relies heavily upon the Feasibility Study, that document similarly provides that alternative 3 would be "Primarily a Surface MEC removal in areas with no soil" (app. R4, tab 6 at 15).

14

comprising about 1% of the site.  GSI combines these two ideas to contend that only 1% of the entire site required subsurface removal (*e.g.*, app. resp. at 3 ("The Decision Document and Feasibility Study are both clear—less than 1% of Area M would require subsurface removal.")).  But these ideas are clearly distinct.  The project site might only be 1% soil, but this does not have any bearing on whether there are cracks and crevices in the ʻaʻa lava that require remediation.

USACE contends that the Board should disregard the Decision Document because it is merely extrinsic evidence (gov't mot. at 15-16).  We have held that the Decision Document is incorporated in the contract, so we reject this assertion.

USACE then contends that the word "primarily" does not mean "only" or "exclusively" (*id.* at 16).  While we agree that it does not mean only or exclusively, USACE never takes the next step to tell us what it does mean.  Instead, USACE merely repeats its assertion that the entire site required "a full surface and subsurface removal" in the entire site (*id.*).

D.  *The Seeding Requirements*

USACE has moved for summary judgment with respect to GSI's contentions concerning seed frequency and seed placement (gov't mot. at 18-21; SOF ¶ 32).  However, it is unclear at this point what GSI was actually required to do in the field (SOF ¶¶ 36-40).  Accordingly, the Board will defer ruling on this issue until the record is adequately developed.

E.  *Withdrawn Issues*

As described above, GSI's claim sought additional compensation for having to remove munitions as small as 37 mm (SOF ¶ 32).  USACE moved for summary judgment on this issue, but GSI did not respond in its opposition brief.  During the conference call on February 28, 2025, GSI confirmed that it was withdrawing that claim (Bd. memo. of conf. call dtd. February 28, 2025).  Accordingly, the appeal with respect to removal of 37 mm munitions is dismissed with prejudice.

GSI's complaint included a count for quantum meruit relief.  The government moved for summary judgment on this issue.  In its response brief, GSI stated that it was withdrawing its claim for quantum meruit (app. resp. at 13 n.1).  Accordingly, Count III of the complaint is dismissed with prejudice.

F.  *Delays By Third-Party Landowners*

The Federal Circuit has held that it is "settled that absent fault or negligence or an unqualified warranty on the part of its representatives, the Government is not liable for damages resulting from the action of third parties." *Oman-Fischbach International (JV) v. Pirie*, 276 F.3d 1380, 1385 (Fed. Cir. 2002) (quoting *Dale Constr. Co. v. United States*, 168 Ct. Cl. 692, 698 (1964)).  Such liability exists only where "the parties in unmistakable terms agreed to shift the risk of increased costs [to the government]." *Id.*

In its claim, GSI alleged that the neighboring landowners repeatedly blocked GSI from entering the site, either by locking the access gates or placing physical barriers across the entry point or, during the digital geophysical mapping portion of the work, that the landowners had not adequately cleared the site of equipment and other materials (SOF ¶ 33).  In its response brief, GSI additionally asserts that because of these actions it had to work around these access issues by traveling "significant distances" and had to "traverse across difficult terrain to approach its work area from a different—inconvenient—approach" (app. resp. at 16).  However, these are comparable complaints to those that the Federal Circuit rejected in *Oman-Fischbach*, in which the contractor complained that the Portuguese Armed Forces locked a gate providing access to a waste disposal site, which forced the contractor to take a longer route around the base, resulting in increased costs.  *Oman-Fischbach*, 276 F.3d at 1382.

In its brief, GSI acknowledges that USACE fulfilled its contractual duty to obtain signed right-of-entry forms from the landowners but it contends that they were "effectively meaningless" because the landowners did not provide access.  GSI also alleges that the USACE project manager attempted to help coordinate the access issues. (App. resp. at 16)  However, even if both of these allegations are true, GSI has not identified any term in the contract that unmistakably shifts the risk of a third-party delay to the government.  Accordingly, the government is entitled to summary judgment on this issue.

16

GSI's partial motion for summary judgment is granted with respect to the incorporation of the Decision Document in the contract. Otherwise, it is denied.

The government's motion is granted to the extent of our determination that the contract required subsurface removal in the cracks and crevices of the 'a'a lava. The government's motion is granted with respect to delays caused by third-party landowners. The Board defers ruling on issues related to frequency and placement of seeds. GSI has withdrawn its claims for the removal of munitions as small as 37 mm and its quantum meruit theory. Those aspects of the claim are dismissed with prejudice.

Dated: May 6, 2025

_____
MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

I concur

_____
OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

_____
DAVID B. STINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63520, Appeal of GSI Pacific, Inc., rendered in conformance with the Board's Charter.

Dated:  May 7, 2025

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

18